RAWLS, Chief Judge.
Appellant was charged with first degree murder of his wife, tried by jury, convicted of murder in the second degree, adjudged guilty, and sentenced to 20 years imprisonment.
There were no eye witnesses to the shooting of defendant’s wife other than the defendant himself, and therefore, the evidence concerning the death was circumstantial in nature. It was the State’s position that the defendant intentionally killed his wife, while defendant contended that his wife was accidentally shot while they were struggling for possession of the pistol. It was proven that the bullet entered decedent’s temple and came out the top of her head. Under these circumstances testimony as to the distance the pistol was located from decedent at the time it was fired was of critical importance.
The sole point of law for determination is whether or not it was prejudicial error to permit a ballistics expert, appearing as a witness for the prosecution, to express an opinion, based on the hereinafter quoted hypothetical question, to the effect that the death-dealing weapon, a P.38 automatic pistol, was held at a distance greater than 30 inches from the victim’s left temple when it fired the lethal bullet.
In seeking reversal appellant contends:
1. That manila paper, the medium used by the ballistics expert in test firing said pistol, was not shown by the evidence to have characteristics sufficiently similar to the human body to render such test a reliable basis on which to express an opinion upon *544 the hypothetical question; and that his position is sustained by McLendon v. State, 90 Fla. 272, 105 So. 406 (1925) and Hisler v. State, 52 Fla. 30, 42 So. 692 (1906); and
2. That the hypothetical question propounded does not form a competent basis for the opinion testimony elicited thereby, in that the question assumes, contrary to the evidence before the jury, that a certain post-mortem photograph admitted in evidence (showing the point of entry of the lethal bullet) depicted the appearance of the victim’s body as it existed following the injury and prior to any post-mortem work thereon substantially changing its photographic characteristics. (Note: There is undisputed testimony to the effect that prior to taking said photograph the area photographed had to some extent been cleaned of blood from the wound.)
The prosecution offered as a witness one Leslie L. Smith who after extensive questioning was held to be qualified and permitted to testify as a ballistics expert. In the course of direct examination the following question was propounded to him:
“Q Now, I want to ask you this question, Mr. Smith, and I want to pose it to you as a hypothetical question. After I complete the question, I want then to ask you if you have an opinion on it as an expert.
“I want you to assume that for the purpose of this question, that Patricia Roberts was shot in the head with this gun that you hold in your right hand, in the left temple.
“Assume further, that the autopsy performed by a Doctor of Pathology, revealed that there was no singeing of the hair around the wound of injury.
“Assume further, that his examination revealed no powder tattooing of the skin around the wound of entry.
“Assume further, that the medical testimony shows that sections of the wound of entry were bisected and examined by microscopic means, and no evidence of powder residue was found.
“And assume further, if you will, for the basis of this question, that there are no lacerations around the margin of the wound, and also for the purpose of the question, I ask you to use your experiences gained as an expert in the field to which you have just testified to this jury to State’s Exhibit No. 2, I believe, which has heretofore been offered into evidence and identified as being Mrs. Patricia Roberts.
“Now, basing your answer upon your experience and also, upon your knowledge of State’s Exhibit No. 3, which is the weapon, and the type and kind and character of the bullets submitted to you for examination, State’s Exhibit No. 7, I believe, do you have an opinion as to the minimum length that this gun would have had to been held to produce the character of the wound shown in State’s Exhibit No. 2?”
The defendant objected on the grounds
“that no proper predicate has been laid for the propounding of such hypothetical question to the witness on the witness stand.
“Secondly, with special attention to that portion of the proposed hypothetical question concerning, ‘Experiences’ with the weapon now held in the witness’s hand which, as I understand it, is State’s Exhibit No. 3.
“It is not appropriately nor properly defined or expressed in the hypothetical question.”
After objection was overruled, the witness answered:
“A. The minimum length at which this gun must have been held would have to be some distance greater than two and a half feet.”
*545 As a foundation for his testimony, Smith testified that he had conducted certain experiments using the death-dealing weapon. First, he fired three shots into a manila folder at various distances from same, viz.: One at 8 inches using a cartridge from his own supply, one at 18 inches, and another at 30 inches. He utilized two of the cartridges found in the lethal weapon for the two latter shots. There is no testimony from Mr. Smith as to the condition of the paper after the shots were fired into the paper at 18 and 30 inches. In all probability such statement was intended to be made, but the record discloses that at this point in the testimony prolonged objections and arguments of respective counsel ensued so that when the smoke cleared, the witness Smith testified only that the gun had to have been held in excess of two and one-half feet from decedent’s head to inflict the wound in the condition that it did. This testimony amounted only to an arbitrary statement of the witness which was not supported by any physical evidence.
Defense counsel, in the absence of the jury, interrogated expert witness Smith at length, the salient parts being as follows:
“A. I say, when I testify, as I have here today, about the test I made on this paper, I have in mind that the test I made on the manila paper is useful as a control and standard to attempt to arrive at what might be seen on the skin of a person who is shot.

“I realise there must be some allowance for a difference, due to the difference in impact susceptibility between skin and paper, but I am as sure as I can be of anything that the technique I am ming is the most practical under the circumstances.

“Q. What test, if any, have you made to determine whether that paper which you hold in your hand is similar to a substance such as human skin?
* * * * * *
“A. This manilla folder paper is certainly not the same as human skin.” (Emphasis supplied.)
. McLendon v. State, supra, sets forth the controlling principle. There, the State offered testimony of a man who was described as one of “wide experience in the use of firearms and the result of their operation and discharge.” He testified that he used the same pistol with which the decedent was killed and the same powder load when he fired several shots into certain targets of paper and cloth, holding the muzzle of the pistol varying distances from the targets. Using these targéts, the witness pointed out to the jury which marks were bullet holes, which were powder marks, and which were powder burns. The evidence in Mc-Lendon reflected that the fatal bullet wound like the one in the case sub judice entered decedent’s head and no powder marks or burns were found upon the flesh of the deceased. There the Supreme Court in rejecting the evidence of these experiments of the expert witness, stated:
“In the case before us there is no evidence that the effect of the gunfire on the paper and cloth targets would be essentially similar to, or would even approximate, the effect of such gunfire upon the human flesh in respect to resulting burns and powder marks. Upon this most essential feature of the evidence we are left entirely to conjecture. Under the facts and circumstances of this case, and in the absence of qualified and credible evidence that the effect of pistol shots upon human flesh and upon paper or cloth targets would be essentially similar in respect to resulting powder marks and burns, we cannot assume that there is sufficient similarity between human flesh and paper or cloth, in texture, substance, vulnerability or, susceptibility, to render such targets either helpful or enlightening as evidence. Nor can we assume that the effect of pistol fire upon human flesh and upon paper or cloth targets would be essentially similar, in respect to powder burns or marks, when the requisite supporting proof is lacking.” (Emphasis supplied.)
*546 Guidelines to qualifying experts have been set' forth by the Supreme Court in Hisler v. State, 52 Fla. 30, 42 So. 692, 695 (Fla. 1906), thusly:
“Evidence of an experiment whereby to test the truth of testimony that a certain thing occurred is not admissible, where the conditions attending the alleged occurrence and the experiment are not shown to be similar. The similarity of circumstances and conditions go to the admissibility of the evidence, and. must be determined by the court. * * * But where such evidence is admitted over proper objections, and the rule as to similarity of circumstances and conditions attending the occurrence and the experiment does not appear to have been complied with in admitting the evidence, the appellate court will review the ruling * * *. Evidence of this kind should be received with caution, and only admitted when it is obvious to the court, from the nature of the experiments, that the jury will be enlightened, rather than confused. In many instances, a slight change in the conditions under which the experiment is made will so distort the result as to wholly destroy its value as evidence, and make it harmful, rather than helpful.”
A proper predicate was not laid for propounding the subject hypothetical question, because the answer necessarily required a determination by the witness as to the powder or gaseous dispersal of the weapon, and such determination must be made with reference to human skin or a material “essentially similar” to human skin. — not as witness Smith testified “ * * * as a control and standard to attempt to arrive' at what might be seen on the skin of a person who is shot” and “having in mind that some allowance must be made in the variable in the density and distribution of the shot fired in this paper, as against what it might be on the skin.” (Emphasis supplied.) The immediate questions that arise from such a predicate as a basis for so-called expert testimony are: How much allowance for “ * * * variable in density * * * ” for “ * * * impact susceptibility between skin and paper ?” By utilizing such a tenuous predicate, the expert witness might well have utilized the “medium” of armored plated steel.
The bald uncontroverted fact appearing in McLendon and here is that á witness sufficiently versed in the matter and propensities of firearms as to be termed an expert utilized the material of paper as a medium to simulate human skin. The Supreme Court of Florida settled this issue' in McLendon when it held: “Nor can we assume that the effect of pistol fire upon human flesh and upon paper * * * would be essentially similar, in respect to resulting-powder burns or marks, when the requisite supporting proof is lacking.” It is firmly established in this and other jurisdictions that assumptions of fact in a hypothetical-question asked of an expert witness must be based upon facts established by competent, substantial evidence. Fekany v. State Road Department, 115 So.2d 418 (Fla.App., 1959) and Young v. Pyle, 145 So.2d 503 (Fla.App., 1962).
The trial judge was correct when he stated:
“ * * * after reviewing that case, McLendon v. State, 90 Fla. 272, 105 So. 406, plus reviewing a couple of others, I am going to sustain the defense’s objection to this type of experiment, as not being under the findings in that case, plus other cases.”
The trial judge erred in subsequently reversing his decision and permitting the witness to answer the subject hypothetical.
Reversed for a new trial.
JOHNSON and SACK, JJ., concur.