506 So.2d 1056 (1987)
Russell BAKER, Appellant,
v.
STATE of Florida, Appellee.
No. 86-1569.
District Court of Appeal of Florida, Second District.
March 25, 1987.
Rehearing Denied May 5, 1987.
Peter D. Ringsmuth, of Smith & Ringsmuth, Fort Myers, for appellant.
Robert A. Butterworth, Atty. Gen., Tallahassee, and Gary O. Welch, Asst. Atty. Gen., Tampa, for appellee.
LEHAN, Judge.
This is an appeal from convictions for manslaughter and attempted manslaughter. Defendant killed one person and injured two others with his pocketknife while defending himself against an attack by them and at least one other. He contends that self-defense was established as a matter of law and that the trial court therefore *1057 erred in denying his motion for acquittal. While empathy with the defendant in his plight can certainly be felt, we affirm. Lethal self-defense[1] was not established as a matter of law in the circumstances of this case because the jury was entitled to conclude that defendant could reasonably have avoided the need to defend himself. The effect of a defendant's reasonably avoidable lethal self-defense can be thought of as, in a sense, converting a defendant's attackers into victims.
The facts of this case may be viewed as reflecting why the jury convicted defendant of manslaughter and attempted manslaughter, rather than of second-degree murder and attempted second-degree murder with which he was charged. We generally summarize the facts as follows. While we include the thrust of defendant's testimony, disputed facts must, of course, be viewed on appeal in the light most favorable to the state.
Defendant, age 60, height 5'6", weight 155 pounds, and his friends, Denise Blankenship, age 21, and John Masters, age 50, went to the beach one afternoon. They were in defendant's car. Denise drove. Defendant produced a pocketknife to cut Masters' pants legs to make swimming trunks for him, but when swimming trunks were found, the knife was not needed. Defendant put the knife in his pocket. After spending about one and a half hours at the beach, the three drove to a convenience store for fuel for the car.
When they arrived at the store defendant went inside to get the fuel pump turned on. Enroute he passed a 17-year-old woman, later identified as Dana LaPierre, to whom he made a comment. The evidence is conflicting as to what he said. Although she testified that what he said had to do with sex, she could not remember what was said, and the most provocative comment attributed to defendant was, "Hey, baby." Defendant then returned to his car, got his glasses, again went into the store to pay for the fuel, once more returned to the car, and stood outside the car next to the right front passenger seat with the door open while Masters pumped the fuel. Defendant testified that he had seen another car in the parking area and noticed that its occupants  five men and a woman (Dana)  were talking loudly, their radio was playing loudly, some had urinated on the wall of the store, and there were beer cans in evidence.
One of those other people, Tony Innes, age 36, height 5'10", weight 190 pounds, approached defendant and, according to defendant, said, "You son of a bitch. What did you say to my wife?" (Dana, who lived with Innes, had told him that defendant had said something to her.) According to defendant, he and Innes talked, after which Innes grabbed defendant's shirt and hit defendant in the head; Masters approached and told defendant to get in the car, but defendant was unable to do so because of the presence by then of other men from the other car; and defendant got his knife out, opened it, and held it down at his side. Defendant said he was hunched down in the opening of the car door while they were beating him. He said he was scared, hurt and trapped in the door opening and stabbed at people to get them away from him. Greg Soltis, one of the men from the other car, was stabbed twice and died. Mark Dillon, another of them, was stabbed once. Tony Innes received cuts which did not require treatment.
The occupants of the other car had been to the beach also where they had consumed what was described as about two cases of beer. The blood alcohol levels of Soltis and Dillon were .18 and .22, respectively. Innes' level is not shown in the record, but he apparently had consumed about two sixpacks of beer. There was testimony that at least some of them had smoked marijuana at the beach. As only an example of other ignominious conduct engaged in by the occupants of the other car during their return from the beach, some of them had beaten two other young men after exchanging *1058 words with them at another convenience store.
The investigating police officer testified that when he arrived, defendant was in the store, was cooperative, and turned the knife over to the officer when requested.
Masters' testimony largely confirmed that of the defendant. He confirmed that defendant never left the triangle, two sides of which were made by the opened car door and the car.
Testimony from occupants of the other car and from Denise differed from that of defendant in various respects. The testimony of Denise was that defendant opened the knife and held it behind his right leg before Innes and the others approached defendant's car. She testified that Innes was not carrying anything like a weapon. She confirmed that defendant and Innes had talked for a few minutes before the stabbing. She testified that "they weren't really punching." She said defendant was shoved before the stabbing. Her testimony was that when defendant and Innes were talking nothing prevented defendant from getting into the car, as Masters had told him to, and that defendant did not do so.
Accordingly, whether or not there was evidence which, if believed by the jury, could have been interpreted by the jury to show that there was no need for defendant to have used deadly force to defend himself, there was evidence from which the jury could have concluded at least that to the extent he perceived such a need he had had that perception in time to have retreated into his car and avoided the need. Denise testified that defendant could have gotten into the car before the violence began. Defendant's testimony was that he was only planning to try to talk to Innes and convince him that defendant had said nothing offensive to Dana. Defendant contends that he had no obligation to retreat under these circumstances. But there was evidence that defendant had already taken out the knife, opened it up, and held it behind his leg before Innes approached, and the jury could have concluded that defendant was then aware of a forthcoming need to use the knife if he stayed where he was. See Blount v. State, 67 So.2d 209 (Fla. 1953) (manslaughter conviction affirmed notwithstanding defendant's plea of self-defense against belligerent attack when defendant had drawn his knife before any hostile action against him began).
We are not entitled to reweigh sufficient evidence. See Tibbs v. State, 397 So.2d 1120 (Fla. 1981), aff'd, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982); Tsavaris v. NCNB National Bank of Florida, 497 So.2d 1338 (Fla. 2d DCA 1986). The jury was entitled to conclude that the defense of self-defense was not applicable. "[A] person under attack [has] to `retreat to the wall or ditch' before taking a life." Cannon v. State, 464 So.2d 149, 150 (Fla. 5th DCA 1985). The "one interposing the defense ... must have used all reasonable means in his power, consistent with his own safety, to avoid the danger and to avert the necessity of taking human life... ." Linsley v. State, 88 Fla. 135, 101 So. 273 (1924).
Defendant cites Ramos v. State, 496 So.2d 837 (Fla. 2d DCA 1986), to support his argument that the defense of self-defense was established. The state argues that Ramos was decided wrongly. We conclude that the facts of Ramos were significantly different. In that case this court, in determining that the defense of self-defense was established as a matter of law, was clear that defendant's lethal self-defense in shooting a knife wielding attacker was justified because the defendant "did not want to fight and tried to leave but was prevented from doing so by the victim's friends... ." 496 So.2d at 838.
Both sides cite Brown v. State, 454 So.2d 596 (Fla. 5th DCA 1984), in which the defense of self-defense was established as a matter of law. Brown illustrates by comparison the reason why we must affirm. In Brown, where defendant was attacked and defended himself by fatally shooting his attacker, the Fifth District Court of Appeal stressed that the defendant had no alternative but to defend himself. In that case he "did what he could to extricate *1059 himself from the situation and armed himself for protection. He attempted to retreat from the battle, but [his assailant] pursued him. As defendant retreated he continued to ask [the assailant] to stay away, to break it off, to leave him alone, but [the assailant] continued to stalk him... . Defendant fired a shot into the ground, still retreating and still asking [the assailant] to stay away, but [the assailant] came on relentlessly. The evidence is clear that defendant fired the second and fatal shot because there was no alternative, because [the assailant] had closed in on him and had defendant turned to run, [the assailant] would have been on him." 454 So.2d at 659-60.
There is an exception to the retreat obligation in the case of a person attacked in his home by a person not having an equal right to be there. Cannon, 464 So.2d at 150-51. Defendant, arguing for a further exception to the retreat obligation, contends that the trial court erred in denying his requested jury instruction to the effect that he had no obligation to retreat if he was attacked in his own automobile. We disagree. The very mobility of an automobile has created the so-called automobile exception to the search warrant requirement. See Chambers v. Maroney, 399 U.S. 42, 50-51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419, 428 (1970). That mobility also may connote the inherent usefulness of an automobile under certain circumstances for a retreat from a self-defense confrontation. Thus, to carve out the exception defendant argues for could seem to virtually eliminate the retreat obligation. In any event, in this case there was evidence that defendant did not get into his automobile before he was attacked.
The conviction in this case might seem to run against the grain of one's instinct, like apparently that of defendant, not to be taken advantage of by others who merit not even common decency. But the use of deadly force against another human being under the circumstances of this case as viewed by the jury went far beyond declining common decency and is not countenanced by the law even if that force is in response to conduct of human beings who act like animals. Illustrations of other types of situations in which contrary precedent would be against the interests of society could be the facts of Ramos and Brown if the defendants in those cases had reasonably been able to avoid killing their attackers.
We find no merit in defendant's remaining contention. See Williams v. State, 454 So.2d 790 (Fla. 5th DCA 1984).
Affirmed.
SCHEB, A.C.J., and CAMPBELL, J., concur.
NOTES
[1] Section 782.02, Florida Statutes (1985), provides: "The use of deadly force is justifiable when a person is resisting any attempt to murder such person or to commit any felony upon him or upon or in any dwelling house in which such person shall be."