526 So.2d 948 (1988)
Steven Wayne BENSON, Appellant/Cross-Appellee,
v.
STATE of Florida, Appellee/Cross-Appellant.
No. 86-2431.
District Court of Appeal of Florida, Second District.
May 20, 1988.
Rehearing Denied June 23, 1988.
*949 Michael R.N. McDonnell and Jerry Berry of McDonnell & Berry, Naples, for appellant/cross-appellee.
Robert A. Butterworth, Atty. Gen., Tallahassee, and Lauren Hafner Sewell, Asst. Atty. Gen., Tampa, for appellee/cross-appellant.
LEHAN, Acting Chief Judge.
Defendant appeals from convictions and sentences for the first-degree murders of his mother and adopted brother, the attempted first-degree murder of his sister, and other related crimes. The crimes involved the placing and detonations on July 9, 1985, of two pipe bombs in a motor vehicle, a Suburban, which was occupied by the victims. We affirm the convictions and sentences.
There were two explosions, one shortly after the other. The murders and the injuries which were inflicted upon the sister were caused by the first explosion which occurred between the vehicle's two front seats. The second occurred under the left rear passenger seat. The sister, who was in the left rear passenger seat at the time of the first explosion, was the sole occupant of the vehicle who survived the bombings. Her testimony for the state included the following:
 Defendant arranged for the mother, the sister, the brother, and himself on July 9, 1985, to measure and stake out property on which the mother planned to build a new house. That morning between 7:45 and 8:00 a.m. defendant arrived in his van at the mother's residence in Naples where the brother lived with the mother and where the sister was visiting. Defendant parked the van in the driveway close to the Suburban. From the house the sister saw him standing at the opened rear doors of the van. His shoulders were moving as though his hands were moving. About five minutes after his arrival, he entered the house, said he was going out to get coffee, and left in the Suburban. He was gone *950 considerably longer than expected. (Other testimony was that he was gone for about an hour.)
 Upon defendant's return, the family members went out to the Suburban. The mother, the brother, and defendant went out before the sister did. It was unusual that defendant had asked that the brother come along. Unusual too was the seating arrangement in the Suburban. Defendant, the eldest son, would normally do the driving when the family traveled together. The brother didn't like to drive. However, when the sister arrived at the Suburban shortly before their planned departure, the brother was sitting in the driver's seat. Although the sister normally sat in the front passenger seat to alleviate her tendency to get car sick and the mother normally sat in the back seat to avoid the air conditioner blowing on her, the mother was sitting in the front passenger seat. Defendant was at first standing next to the vehicle at the opened right rear passenger door and then sat partially inside on the edge of the right rear passenger seat. The sister, who was to sit in the only other available seat, the left rear passenger seat, was entering from the left rear door.
 The mother asked who had the car keys. At that point defendant exited the vehicle, walked around its rear, gave the sister a boost into the vehicle, and started to close the left rear door. But the sister asked him to leave it open. Defendant handed the brother the keys through the driver's open window. Defendant then said he was going back to the house to get a tape measure he had forgotten. The sister saw him pass the front of the vehicle. After she straightened up from having bent over to pick up a drink glass which she had brought with her, he was no longer in view.
 The brother moved as if to start the vehicle. Suddenly the sister was surrounded by an orange cloud. Flames came up from the front seat. The force of the explosion pressed her back into the seat. When she opened her eyes, she could see the body of the brother lying on the ground. She threw herself out of the vehicle. Her clothing was on fire, and she rolled on the ground to try to put out the flames.
 When the sister thereafter sat up, she saw defendant standing on the walk in front of the house. He was standing still, staring toward the vehicle. The sister could not understand why he did not come over to help. Then his eyes opened wide, his mouth dropped, and he said, "Oh, my God, my God." He ran back toward the house. Two men approached the sister and helped her across the street. She could then see defendant moving about near the Suburban in an agitated state. A man approached and dragged him away. She had no recollection of the second explosion.
Defendant, who did not testify at the trial, was not hurt by the explosions. A police officer testified that defendant said that he had taken the Suburban to get coffee because his van didn't have enough fuel to go for coffee and get to work later. The evidence showed that the fuel tank on defendant's van was about one-quarter full. The trip to the Shop 'N Go, where defendant said he went for coffee when he was gone for about an hour, was 7.2 miles round trip. The record does not appear to contain the distance to his office but does show that it was about a twenty minute drive to his office from his mother's house. Among the debris near the Suburban after the explosions was a tape measure.
Expert testimony for the state was that the explosions were caused by two pipe bombs filled with gunpowder. From their examinations of fragments, experts concluded that galvanized steel pipes were used in the bombs and were 12" in length and 4" in diameter and that galvanized steel end caps were also used in the bombs and were for 4" pipe. One expert, Albert Gleason, testified that the end caps appeared to have been secured onto the ends of the pipes to contain the gunpowder and that the bombs probably had been detonated electronically or electrically.
At Hughes Supply, a business which sold plumbing supplies and which was located a few hundred yards from defendant's office, investigators located receipts for the purchases of galvanized steel pipes and end *951 caps having the same dimensions as those used in the bombs. One receipt, dated July 5, 1985, was for two 4" end caps. The other, dated July 8, 1985, the day before the bombing, was for two 4" by 12" pipes. Palm prints were found on each receipt. Before defendant's arrest a search warrant was obtained for his palm prints. His palm prints matched those on the receipts.
Salesmen at Hughes Supply were unable to identify defendant from photographs, but they could not rule out defendant as the purchaser. A composite sketch was prepared by the police as being based upon the description of the purchaser by one of the salesmen. The sketch resembled defendant, and the salesman's testimony was that the sketch resembled the purchaser.
There was testimony by another witness that at the funeral for the mother and the brother defendant stated that in the past he had made and exploded bombs composed of copper pipe and gunpowder. Defendant argues to the effect that the statement, if made, could have referred only to firecrackers. He also argues other interpretations of other aspects of the evidence. However, on appeal from the convictions we must view the evidence in the light most favorable to the state as it could reasonably have been interpreted by the jury. See Baker v. State, 506 So.2d 1056, 1057 (Fla. 2d DCA 1987); Buenoano v. State, 478 So.2d 387, 390 (Fla. 1st DCA 1985).
The mother's estate, of which defendant was an heir, was valued at $10 million. There was testimony that the mother had been suspicious about defendant's sloppy bookkeeping and possible misappropriations of money from family businesses which he ran, which she owned and financed, and which were losing money. The mother had been paying defendant's compensation for running the businesses. The businesses included the marketing of burglar alarm systems. Also, the mother had learned that without her knowledge defendant had started up another business. Other evidence showed that on July 8, 1985, she had for the first time seen defendant's new home in Fort Myers and was surprised by its large size and its tennis courts and swimming pool. She was angry about another business having been started without her knowledge and about the size of defendant's home. On July 8 she had a heated discussion with defendant. She asked defendant whether he had sold a Datsun 280Z which he had owned. When defendant said yes, she shook her head. When she told defendant that she had seen the car parked at his home earlier that day, defendant had no response. The mother had also learned that funds from one of the businesses had been put into defendant's personal bank account. Blank checks signed by the mother and intended for household expenses while she had been in Europe had gone toward, among other things, the down payment on defendant's home.
At the time of the crimes the mother's attorney was in town at her request and was looking into defendant's suspected mismanagement of the businesses. On July 8, 1985, the day before the bombings and the day of the purchase of the pipe at Hughes Supply, the mother and the attorney had been looking at the books of those businesses. The mother had asked defendant to complete the books and bring them to the attorney the next day, July 9, 1985. When the mother told defendant that she and the attorney planned to work late that night, defendant appears to have feigned a prearranged social engagement.
On appeal defendant raises various contentions of reversible error with which we do not agree. The general nature of those contentions is summarized as follows. First, he contends that the evidence in this circumstantial evidence case was insufficient to establish his guilt. Second, he contends that the expert testimony regarding the pipe materials used in the bombs was based upon invalid assumptions. Third, he contends that the defense should have been permitted to recall the sister for further cross-examination concerning alleged inconsistencies in her testimony of which the defense first learned toward the end of the defense case. Fourth, he contends that the trial court should not have admitted into evidence the composite *952 sketch linking defendant to Hughes Supply. Fifth, he contends that he was denied a fair trial from the cumulative effect of various errors involving venue, jury selection, lack of jury sequestration, alleged prosecutorial misconduct, and disallowance of certain testimony about his mother's will and about the deceased brother having been dealing in narcotics. Sixth, he contends that the pre-arrest taking of his palm prints was improper. Seventh, he contends that he received an illegal sentence. This contention is that he improperly received consecutive sentences. He argues that the trial court improperly imposed consecutive 25-year mandatory minimum sentences as parts of the life sentences for the murders of the mother and brother and additional sentences consecutive to the life sentences, but concurrent with each other, for the related crimes, including the attempted first-degree murder of the sister.
We now address each of those contentions.

I. Sufficiency of the Evidence

Defendant's argument that the circumstantial evidence was insufficient to support his convictions and that, therefore, the trial court erred in denying his motion for a directed verdict of acquittal, has two aspects: (a) that in order for the evidence to be construed as showing that he was responsible for the pipe bombs, there had to have been an improper pyramiding of inferences and (b) that the evidence failed to eliminate every reasonable hypothesis of innocence.
As to (a), Defendant's argument includes the points that there was no evidence directly showing that the particular pipe materials used in the bombs were the same as those purchased from Hughes Supply and that there was no evidence directly showing that defendant had constructed and detonated the bombs. But permissible inferences do not require the exclusion of all other possible hypotheses. See Buenoano v. State, 478 So.2d at 390. Among the evidence involving inferences bearing upon defendant's guilt in this case were the testimony of the sister as to defendant's activities prior to the bombings; the evidence that the relatively large diameter dimensions of the galvanized steel pipe materials, which, from the palm print evidence, could be concluded to have been purchased by defendant from Hughes Supply shortly before the bombings, were identical to the dimensions of that type of pipe materials used in the bombs; defendant's last purchase of those materials having been on the day the mother was looking closely into his suspected business mismanagement and had asked him to bring the books to her attorney the next day, which was the day of the bombings; the evidence as to why defendant used the Suburban the morning of the bombings, how long he was gone with the Suburban, and as to why he departed from the Suburban immediately prior to the bombings; and defendant having made pipe bombs in the past.
Defendant nonetheless vigorously argues that a pyramiding of inferences is improper and that there was necessarily a pyramiding of inferences in this case because, inter alia, the basis for the inferred conclusion that defendant built and detonated the bombs had to have been the inference that the materials used in the bombs were those which it was concluded he had purchased from Hughes Supply. Be that as it may, the general rule against the pyramiding of inferences is not rigidly applicable in all cases. There is an exception to the rule: "[W]hen no contrary reasonable inference may be indulged, such inference is elevated for the purpose of further inference to the dignity of an established fact." Voelker v. Combined Insurance Company of America, 73 So.2d 403, 407 (Fla. 1954). See also Shepherd v. Finer Foods, Inc., 165 So.2d 750 (Fla. 1964); Goode v. Walt Disney World Co., 425 So.2d 1151, 1155 (Fla. 5th DCA 1982); Firemen's Fund American Life Insurance Co. v. Wohl, 334 So.2d 261, 263-64 (Fla. 3d DCA 1976); 23 Fla.Jur.2d Evidence and Witnesses § 87 (1980). Thus, for the purpose of inferring that defendant built and detonated the bombs, the inference that the materials used in the bombs were those which, under the evidence, defendant had *953 purchased from Hughes Supply may be in effect elevated to the dignity of established fact if, as was the permissible effect of the jury verdict, the evidence in its totality supports no contrary reasonable inference. Under these circumstances the reason for the general rule against the pyramiding of inferences  to avoid judgments based upon speculation, see Voelker, 73 So.2d at 407  does not exist.
The Florida cases in which the exception to the general rule against the pyramiding of inferences has been discussed apparently are all civil cases. No Florida criminal case has been cited to us, nor have we found any, in which that aspect has been raised. But we see no sound reason why this exception does not and should not also apply to the admissibility of evidence in a criminal case. As the Florida Supreme Court recognized in Voelker, "cases may and do exist wherein circumstantial evidence is as convincing of an asseverated fact as is testimonial evidence." 73 So.2d at 407. See also Holland v. United States, 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150, 166-67 (1954). This does not affect application of the ultimate, beyond a reasonable doubt, criminal standard for guilt as compared to the lesser standard for civil liability. And, to apply the requirement that the inference which forms the basis for another inference must be arrived at under such circumstances that no contrary reasonable inference exists is to apply what Voelker referred to as the criminal standard concerning circumstantial evidence. 73 So.2d at 407. The Voelker exception is very much like, if not simply another version of, the criminal requirement that the evidence exclude every reasonable hypothesis of innocence, as required, for example, in Fowler v. State, 492 So.2d 1344 (Fla. 1st DCA 1986).
Another way of expressing the Voelker exception has been to say that an inference may be admissible into evidence, even though it is based upon another inference, if the other inference has been shown to exist beyond a reasonable doubt. See 1A J. Wigmore, Evidence § 41 (P. Tillers rev. ed. 1983). That is the rule which has been abandoned in criminal, as well as civil, cases in Arizona in favor of a less restrictive approach to admissibility. The approach adopted in Arizona is that, for the purpose of admissibility of evidence, no distinction is to be made between direct evidence and circumstantial (or inferential) evidence and that otherwise admissible evidence of whatever nature is to be weighed by the jury in determining whether in a criminal case guilt has been established beyond a reasonable doubt. See State v. Harvill, 106 Ariz. 386, 391, 476 P.2d 841, 846 (1970). See also Farm-Aero Service Inc. v. Henning Produce, Inc., 23 Ariz. App. 239, 242-43, 532 P.2d 181, 184-85 (1975) (explaining Harvill and quoted in J. Wigmore, supra, at n. 6).
Federal criminal cases appear consistent with the Arizona approach and also consistent in basic rationale with our application of the Voelker exception. For example, in Toliver v. United States, 224 F.2d 742, 745 (9th Cir.1955), it was said that "The old rule ... that an inference predicated upon an inference is inadmissible has been repudiated. [Citations omitted.] The acceptability of the inference drawn turns on whether it has been founded upon `fact' regardless of whether such fact has been arrived at by direct or circumstantial evidence." There are state criminal cases to the same effect. See Annotation, Modern Status of the Rules Against Basing an Inference Upon an Inference or a Presumption Upon a Presumption, 5 A.L.R. 3d 100, 161-62 (1966). Indeed, it has been said that a rigid rule prohibiting the basing of an inference upon an inference has received "almost unanimous criticisms of legal scholars and of those courts which have gone into the matter at any length." Id. at 105.
Foremost among legal writings criticizing the rule purportedly prohibiting the basing of an inference upon an inference is Wigmore, a prior edition of which was described in Voelker, 73 So.2d at 407, as having "justly and appropriately criticized" the rule. Wigmore, referring to the "once suggested" rule limiting evidence of an inference based upon an inference, states:

*954 There is no such orthodox rule; nor can there be. If there were, hardly a single trial could be adequately prosecuted... . All departments of reasoning, all scientific work, every day's life and every day's trials proceed upon such data. The judicial utterances that sanction the fallacious and impracticable limitation, originally put forward without authority, must be taken as valid only for the particular evidentiary facts therein ruled upon.
... .
The fallacy has been frequently repudiated in judicial opinions.
Id. at 1111, 1120.
Particularly apropos to this case is the additional statement in Wigmore that
[S]ingle inferences, though weak when taken individually, may be substantial and powerful when added together... . [T]he probative strength of an underlying inference is a factor that affects the strength of the final factum probandum but ... no mechanical rule can be laid down concerning how strong any underlying inference must be. The question is not whether any given inference in a chain is too weak but is always whether, in view of all patterns of corroborating and contradicting evidence at all levels of all inferential chains, the final factum probandum has been shown to the degree of likelihood required by the applicable standard of persuasion. .. .
Id. at 1138.
The method of approach represented by Toliver and the Arizona cases is that the pyramiding of inferences is not impermissible and that the totality of the evidence, including inferences, is to be considered in evaluating the validity of the ultimate conclusion at issue. Under this method there is not a technical dissection of the evidence to determine which steps in a logical progression of the evidence are deemed to have been founded upon inferences and which upon primary facts. This method was described and endorsed in Dirring v. United States, 328 F.2d 512, 515 (1st Cir.1964), as follows:
The defendant cautions us against "piling inference upon inference." As interpreted by the defendant this means that a conviction could rarely be justified by circumstantial evidence. See 1 Wigmore, Evidence, § 41 (3d ed. 1940). The rule is not that an inference, no matter how reasonable, is to be rejected if it, in turn, depends upon another reasonable inference; rather the question is merely whether the total evidence, including reasonable inferences, when put together is sufficient to warrant a jury to conclude that defendant is guilty beyond a reasonable doubt. [Citations omitted.] If enough pieces of a jigsaw puzzle fit together the subject may be identified even though some pieces are lacking. Reviewing the evidence in this case as a whole, we think the jury was warranted in finding beyond a reasonable doubt the picture of defendant Dirring.
Similarly, reviewing the evidence as a whole in the case before us, we conclude that the jury was warranted in perceiving beyond a reasonable doubt the picture of defendant as the perpetrator of the crimes. See also Sadler v. United States, 303 F.2d 664, 665 n. 3 (10th Cir.1962) ("The rule against `inference upon an inference' has been severely criticized by text writers.").
Both methods of approach  that of there being an exception to the general rule against the pyramiding of inferences and that of considering instead the totality of the evidence  appear, in the final analysis, to mean essentially the same thing. In any event, under either method our conclusion in this case as to the sufficiency of the evidence is the same.
In his argument about the pyramiding of inferences defendant relies upon Weeks v. State, 492 So.2d 719 (Fla. 1st DCA 1986), rev. dismissed, 503 So.2d 328 (Fla. 1987). In Weeks, the First District Court of Appeal vacated manslaughter convictions of a father and son as aiders and abettors. As to the state's case against the father, the First District noted that from evidence that he had purchased ammunition having the same brand and caliber as some of the ammunition found at the crime scene, the jury would have had to have inferred that *955 the ammunition he had purchased had been the same as that found at the scene and from that inference would have had to have inferred that the perpetrators had used the ammunition with his permission and that he had intended the commission of the crimes. 492 So.2d at 722. A similar analysis was applied regarding the son relative to evidence as to whether his truck and boat had been used in the crimes. It was concluded that there was an "impermissible pyramiding of inferences." Id.
However, the case at hand is unlike Weeks. In that case the father and the son were being tried as aiders and abettors and the inferences that the ammunition the father had purchased, as well as the son's truck and boat, were used in the crimes were not sufficient to show the father's and son's involvements in the crimes because for that purpose it would have been also necessary to infer causal links between the actual perpetrators and them as well as intent on their parts. Id. at 722. Under the circumstances of that case it does not appear that the exception to the general rule against the pyramiding of inferences which we have described could have been properly applicable. One reason is that it does not appear that there was any evidence of causal links between the actual perpetrators and the father and son, i.e., there was no evidence that the ammunition and the truck and boat were used by the perpetrators with the permission of the father and son. Thus, there were reasonable inferences contrary to any inferences of any such links. Nor, for that same reason, does it appear that under the totality of the evidence method of approach a proper verdict of guilt could have been reached in Weeks. In contrast, in the case before us there was evidence showing defendant at the scene of the crimes at the time of the crimes being involved in activities circumstantially related to the crimes. Weeks was a significantly different kind of case because the multiplicity of types of evidence which the jury in this case was entitled to conclude linked defendant to the crimes did not exist in that case.
While Weeks does not refer to the exception to the general rule against the pyramiding of inferences, the cases cited in Weeks for that rule all rely upon Gustine v. State, 86 Fla. 24, 97 So. 207 (1923), which long antedated Voelker and Shepherd. Also, it does not appear that either that exception or the totality of the evidence method of approach would have been properly applicable in Gustine or in any those cases cited in Weeks to have justified convictions based upon the kinds of circumstantial evidence involved in those cases. Those cases were significantly different from the case now before us for the same reason that Weeks is significantly different.
As to (b), whether there was a reasonable hypothesis of innocence and whether the evidence failed to eliminate such a hypothesis were issues for the jury to decide and were argued to the jury. See Heiney v. State, 447 So.2d 210 (Fla.), cert. denied, 469 U.S. 920, 105 S.Ct. 303, 83 L.Ed.2d 237 (1984). See also Bradford v. State, 460 So.2d 926, 931 (Fla.2d DCA 1984) ("The accepted standard on review ... is not whether the evidence failed to exclude every reasonable hypothesis but that of guilt, but whether there was substantial, competent evidence for a jury to so conclude.").
Fowler, also relied upon by defendant, does not call for a contrary result. In that case the First District stated that "a circumstantial evidence case should not be submitted to the jury unless the record contains competent, substantial evidence which is susceptible of only one inference and this inference is clearly inconsistent with the defendant's hypothesis of innocence." 492 So.2d at 1347-48. That statement no doubt refers to a reasonable hypothesis of innocence. A hypothesis of innocence presented by defendant in the case at hand is that he did not commit the crimes. The record contains a body of competent, substantial evidence susceptible of the one reasonable inference that he did commit the crimes and that no one else did. Contrary to other arguments of defendant, that reasonable inference could properly exclude as perpetrators the brother, the attorney, and unknown persons possibly out to get the brother. The jury could well *956 have concluded that there was no more than a bare possibility of the involvement of any of them. As the Florida Supreme Court significantly said in Lincoln v. State, 459 So.2d 1030, 1031-32 (Fla. 1984), quoting State v. Allen, 335 So.2d 823, 826 (Fla. 1976),
We are well aware that varying interpretations of circumstantial evidence are always possible in a case which involves no eye witnesses. Circumstantial evidence, by its very nature, is not free from alternate interpretations. The state is not obligated to rebut conclusively every possible variation, however, or to explain every possible construction in a way which is consistent only with the allegations against the defendant. Were those requirements placed on the state for these purposes, circumstantial evidence would always be inadequate to establish a preliminary showing of the necessary elements of a crime.
Jackson v. State, 511 So.2d 1047 (Fla.2d DCA 1987), additionally cited by defendant, is also distinguishable. In that case, in which this court concluded that circumstantial evidence was insufficient to convict a defendant of first-degree murder and armed burglary, there was no evidence placing the defendant at the scene of the crime, no indication of any relationship between the defendant and the victim, and no fingerprint evidence connecting the defendant to the crime. Id. at 1049.
The standard of review of the denial of a motion for acquittal is whether there was substantial, competent evidence of guilt. Bradford. On this record we cannot conclude that the trial court erred in submitting the reasonable hypothesis issue to the jury and that the evidence of guilt was not substantial and competent.

II. Admissibility of Expert Testimony

Defendant challenges the expert testimony of Theodore Toth, a metallurgist, and Gleason, a bomb technician. Defendant contends that the trial court erred in admitting into evidence under section 90.705, Florida Statutes (1985), their opinions regarding the materials used in the pipe bombs because the underlying bases for their opinions were not properly established. We do not agree.
As we have said, investigators had located receipts, bearing defendant's palm prints, for the purchases of two 4" end caps on July 5, 1985, and two 4" by 12" pieces of pipe on July 8, 1985. There was testimony that the purchased materials conformed with industry standards. The experts analyzed pieces of metal gathered at the site of the blasts. These pieces included fragments of 4" caps and of 4" pipe.
The pipe fragments could not be directly measured. It was concluded that the pipe used in the bombs was of 4" diameter because the end cap fragments came from 4" end caps. The conclusion that the end caps were 4" was based upon extrapolating the circumferences of end caps from fragments from which end caps were partially reconstructed. The conclusion that the pipe was 4" because the end caps were 4" was based upon the premise that the caps had been screwed to the pipe, as was Gleason's testimony, because otherwise the pipe bombs would not have worked. A basis for the further conclusion that the pipe used in the bombs had been 12" long was the dimensions of the threading on the fragments showing those dimensions as corresponding to that length under industry standards.
Defendant, citing Roberts v. State, 189 So.2d 543 (Fla. 1st DCA 1966), argues that there was no evidence that the end caps used in the bombs had been screwed to the pipe or that the pipe used in the bombs corresponded to industry standards. However, Roberts is materially distinguishable. In that case the opinion of a ballistics expert was deemed inadmissible because his opinion was based upon the assumption that manila paper, which he used in tests reconstructing the murder, had the same characteristics as human skin. This assumption was established to have been invalid as having no basis in the field of ballistics. Here, however, the premise that the end caps had been screwed to the pipe in order for the bombs to have worked did *957 not suffer from that type of infirmity. An expert's admissible testimony need not be to a certainty. See Amazon v. State, 487 So.2d 8, 12 (Fla. 1986); Nationwide Mutual Insurance Co. v. Griffin, 222 So.2d 754 (Fla. 4th DCA 1969); 24 Fla.Jur.2d, Evidence and Witnesses § 683 (1981). To the extent the expert testimony in this case involved basing inferences upon inferences, that was not impermissible and was a matter for the jury to consider. See Zack v. Centro Espanol Hospital, Inc., 319 So.2d 34 (Fla. 2d DCA 1975); 1 C. Ehrhardt, Florida Evidence § 704.1 (2d ed. 1984). Whether the pipe used in the bombs was that which defendant purchased and corresponded to industry standards was also for jury consideration under the circumstances. "A trial court has wide discretion concerning the admissibility of evidence and the subjects about which an expert can testify." Stano v. State, 473 So.2d 1282, 1287 (Fla. 1985), cert. denied, 474 U.S. 1093, 106 S.Ct. 869, 88 L.Ed.2d 907 (1986). We find no abuse of that discretion here.

III. Restriction of Cross-Examination

Defendant's contention of reversible error in the refusal to permit further cross-examination of the sister is based upon certain information having been received by defense counsel for the first time toward the end of trial. That information, which was provided by the personal representative of the mother's estate, was that in September 1985 the sister had made statements to the personal representative and others which the personal representative believed were not consistent with some of the sister's trial testimony. We do not conclude that there was reversible error in the trial court's express and implicit determinations that those September 1985 statements, as proffered, were not materially inconsistent with her trial testimony, did not constitute exculpatory evidence improperly withheld in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and did not require that the defense be allowed to cross-examine the sister in that regard.
The personal representative's information, which, as the trial court indicated, appears to have been offered from a commendable sense of duty, included that in September 1985, the sister had not mentioned the men who helped her across the street after the explosion and had not mentioned seeing the deceased brother's body. Also included was the information that in September 1985 she described being pushed to the ground by the orange cloud immediately after the explosion, rather than throwing herself from the car onto the ground; could recall a second explosion; and did not describe defendant having a blank stare on his face after the explosion. Rather, she was said by the personal representative to have then said that his face reflected "shock, horror, and disbelief." The personal representative recalled that both then and at trial, she said that defendant had said, "Oh, my God." But it was the personal representative's expressed belief that she mentioned this exclamation as a mere afterthought at trial, rather than to convey her impression of concern on defendant's part as she had done earlier.
While the sister's September 1985 statements evidently had not been the same as her trial testimony, we cannot conclude that the trial court abused its discretion reversibly in determining that there were no material inconsistencies. As the court noted, "[E]very witness in here said something they didn't say in their deposition... . That doesn't mean what they said is wrong or improper. It's just that they remember some points better than others... ." Also, in our view the differences between any admissible evidence in her earlier statement and her trial testimony largely could not "be raised to the `favorable evidence' status as per Brady" and were "inconsequential deviations." Nelson v. State, 362 So.2d 1017, 1020 (Fla.3d DCA 1978). See also Minton v. State, 113 So.2d 361 (Fla. 1959); Williams v. State, 275 So.2d 284 (Fla.3d DCA 1973).
The information as to the difference between the sister's descriptions of defendant's demeanor has given us pause for especially close attention. But we do not conclude that that aspect calls for reversal. *958 That difference related by the personal representative concerned events after the initial blast, as did the other alleged inconsistencies referred to above, but it was her testimony described further above as to events before that blast which provided the overwhelming bulk of her testimony which incriminated defendant. In any event, her trial testimony additionally was that defendant appeared agitated afterward. Also, the sister's ability to recall both before and after that blast had been the subject of extensive cross-examination. See Mills v. State, 476 So.2d 172, 176 (Fla. 1985). We have no reasonable doubt that the jury verdict would have been no different had the sister been further cross-examined. See State v. DiGuilio, 491 So.2d 1129, 1135 (Fla. 1986).[1]

IV. Admissibility of the Composite Sketch

Defendant argues that the trial court erred in admitting into evidence the composite sketch, used to link defendant to Hughes Supply, because the sketch was prepared less from witness recollection than from defendant's features. While this argument is not without persuasiveness, we do not conclude there was reversible error. Although the Hughes Supply salesman had difficulty recalling the features of the purchaser of the plumbing materials, he could not rule out that the purchaser was defendant, and his testimony was that the sketch did resemble the purchaser. Also, the sketch was by no means the only evidence linking defendant to Hughes Supply. As we have said, the receipts for the purchases of pipe materials bore defendant's palm prints. (The receipts identified the purchaser as "Delray Construction," apparently a nonexistent entity.) Thus, even without the sketch, defendant was linked with the purchases from Hughes Supply. Accordingly, it is unnecessary for us to reach the related defense contention that the trial court erred in not permitting testimony from a proffered defense witness regarding the preparation of the composite sketch.

V. Cumulative Effect of Prejudicial Error

We do not find reversible error in defendant's contentions relating to venue, lack of jury sequestration, jury selection, and the disallowance of additional testimony about his mother's will and about the deceased brother having been dealing in narcotics. Nor do we find such error in the contentions of prosecutorial misconduct.
One alleged instance of prosecutorial misconduct especially drew our attention. During the trial the state asked, "Officer, was that your mother and brother that was laying out in the yard blown to pieces?" By itself, the question appears to have had most inflammatory connotations. Yet the question should be considered in the context of the redirect examination of the officer during which the question was asked. On cross-examination the defense had brought out from the officer, based upon his deposition, that, contrary to his direct testimony that defendant was calm shortly after the explosions, defendant had been no calmer than anyone else. The purpose of the redirect examination question was to try to put the officer in the place of defendant as though the officer's mother and brother had been involved and to try thereby to rehabilitate the officer's direct testimony by showing that a person whose mother and brother had been involved would have been more upset than others, not merely no calmer than anyone else. While we do not favor the phrasing used by the prosecutor, neither can we say that the question in its context amounted to reversible prosecutorial misconduct.

VI. Denial of Motion to Suppress Palm Prints

Defendant contends that there was error in the denial of his motion to suppress *959 his palm prints obtained at his attorney's office before his arrest. He argues that (a) there was no authority for the issuance of the search warrant pursuant to which his palm prints were obtained and (b) even if there had been such authority, the warrant was constitutionally impermissible because it was issued without probable cause. We do not agree.
As to (a), defendant argues that section 30.31, Florida Statutes (1985), refers only to fingerprinting when charges against the person fingerprinted are pending or proven, thus by implication prohibiting prearrest fingerprinting. However, we find no purpose in that section, which has since been repealed, to prohibit prearrest fingerprinting. Defendant also argues that the search warrant was not authorized by chapter 933, Florida Statutes (1985), because a warrant is authorized only for the seizure of property or things, not of a person. However, chapter 933 specifically contemplates searches of persons. See §§ 933.04, 933.07. Section 933.07 provides for warrants "to search ... the person named, for the property specified." Section 933.02(3) provides for a search warrant "[w]hen any property constitutes evidence relevant to proving that a felony has been committed." We conclude that since fingerprints, when taken, are property, the search of a person for fingerprints (in this case palm prints) is a search for property within the contemplation of the statute.
As to (b), Hayes v. Florida, 470 U.S. 811, 817, 105 S.Ct. 1643, 1647, 84 L.Ed.2d 705, 711 (1985), authorizes prearrest fingerprinting in circumstances like those of the instant case under the following three-part test:
[T]he Fourth Amendment would permit seizures for the purpose of fingerprinting, if there is reasonable suspicion that the suspect has committed a criminal act, if there is a reasonable basis for believing that fingerprinting will establish or negate the suspect's connection with that crime, and if the procedure is carried out with dispatch.
We conclude that the requirements of that test were met in this case.
Among defendant's arguments is a reference to the Hayes test being dicta. Be that as it may, Hayes states the applicable law. As this court also said in Hayes v. State, 488 So.2d 77, 79 (Fla.2d DCA 1986),
We conclude that under Schmerber [Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966)], there is neither a fourth amendment, fifth amendment nor sixth amendment violation of a compelled submission to fingerprinting when ... it is ... carried out with dispatch.
... .
[T]he constitutional protections against compulsion do not apply when that compulsion makes the accused the source of identification related evidence... . [F]ingerprint evidence is one of the least intrusive types of evidence that may properly be obtained by means of compulsion.
While defendant additionally argues that the affidavit pursuant to which the search warrant was issued was factually deficient and contained unsupported assertions, we conclude that the affidavit was sufficient to fulfill section 933.02(3) and the first two requirements under Hayes as quoted above.

VII. Imposition of Consecutive Sentences

Defendant argues that the trial court's imposition of consecutive 25-year mandatory minimum sentences as parts of the life sentences for the first-degree murders of the mother and brother was erroneous because those crimes occurred from a single incident. We disagree.
The Florida Supreme Court addressed this type of issue in Palmer v. State, 438 So.2d 1 (Fla. 1983), a pre-sentencing guidelines case which has continuing validity under the guidelines. See State v. Suarez, 485 So.2d 1283 (Fla. 1986). In Palmer, the defendant had entered a funeral parlor, held a revolver to the assistant funeral director's head, and ordered him to inform the mourners present that a robbery was taking place. The defendant was subsequently sentenced to 13 consecutive sentences for robbery, each with a three-year *960 mandatory minimum, for a total of 39 years. The Florida Supreme Court, concluding that the 13 robberies had arisen "from the same criminal episode," 438 So.2d at 2, 3, rejected the state's argument that the "stacking" of consecutive mandatory minimum sentences was permitted. Palmer stressed that its holding would not "prohibit consecutive mandatory minimum sentences for offenses arising from separate incidents occurring at separate times and places." Id. at 4.
In this case there is no dispute that the two first-degree murders did not occur in "separate incidents" at "separate times and places." The blast which killed the mother and brother was one incident at one time and place. Just as the defendant in Palmer committed 13 robberies with one revolver, the defendant here committed two murders with one pipe bomb. However, while the language of Palmer would seem to prohibit consecutive mandatory minimum sentences for the two homicides in this case, a subsequent Florida Supreme Court case, State v. Enmund, 476 So.2d 165 (Fla. 1985), created an exception to Palmer applicable to homicides.
In Enmund the Florida Supreme Court approved life sentences with consecutive 25-year mandatory minimums because there were "two separate and distinct homicides," Id. at 168. Enmund held that "the minimum mandatory time to be served before becoming eligible for parole from a conviction of first-degree murder may be imposed either consecutively or concurrently, in the trial court's discretion, for each and every homicide." Id. See also Gardner v. State, 515 So.2d 408, 411 (Fla. 1st DCA 1987); Kalway v. State, 504 So.2d 792 (Fla.2d DCA 1987).
Accordingly, the trial court acted within its authorized discretion in imposing two consecutive 25-year mandatory minimum sentences for the two first-degree murder convictions in this case.
The two first-degree murder convictions were pursuant to counts I and III of the indictment. Defendant also challenges the sentences pursuant to counts V through IX, for which no mandatory minimum sentences were imposed, and contends that the imposition of consecutive sentences regarding these counts will improperly prevent parole eligibility for a term greater than the 25-year mandatory minimums imposed for the murders. Though the sentences pursuant to counts V through IX are concurrent with each other, they together are specified to be served consecutive to the sentences for counts I and III. The sentences for counts V through IX include 22 years for arson pursuant to count V, 15 years for arson resulting in injury pursuant to each of counts VI, VII, and VIII, and 22 years for the attempted first-degree murder of the sister pursuant to count IX. (No sentences were imposed for the convictions for deaths resulting from the discharge of a destructive device pursuant to counts II and IV.)
We do not agree with defendant that the sentences pursuant to counts V through IX cannot properly be consecutive to the sentences pursuant to counts I and III. Because no mandatory minimum sentences were imposed pursuant to counts V through IX, Palmer's prohibition of consecutive mandatory minimums does not apply to the sentences for those counts.[2] The sentences for counts V through IX are governed by section 775.021(4), Florida Statutes (1985), which authorizes consecutive sentences.
Affirmed.
HALL and PARKER, JJ., concur.
NOTES
[1] The personal representative also related a September 1985 statement by the sister that "My brother cannot have done it." But that statement was not shown to have been any more than an inadmissible conclusion as to the ultimate issue in the case which it was the jury's province to decide. See Gibbs v. State, 193 So.2d 460, 463 (Fla.2d DCA 1967). Also, it does not appear that the statement would have been admissible for impeachment of the sister because the sister did not say on direct examination that defendant did do it.
[2] No issue has been raised as to, and we do not address, whether section 775.087(2)(a), Florida Statutes (1985), may be construed under the circumstances of this case to require three-year mandatory minimums for the sentences pursuant to counts V through IX.